In re: the Application of: TEXAS KEYSTONE INC.
Case No. 3-12-mc-00041-MRK

**BRIEF IN SUPPORT OF TEXAS KEYSTONE INC.'S
MOTION TO COMPEL PRODUCTION**

# EXHIBIT D

# CLIFFORD CHANCE

**CLIFFORD CHANCE LLP**
10 UPPER BANK STREET
LONDON
E14 5JJ
TEL +44 20 7006 1000
FAX +44 20 7006 5555
DX 149120 CANARY WHARF 3
www.cliffordchance.com

**By Email and Courier**

Our ref: 70-40463155
Direct Dial: +44 207006 4880
E-mail: alex.panayides@cliffordchance.com

**Jones Day**
21 Tudor Street
London EC4Y 0DJ
(sjpearson@JonesDay.com;
dtravers@JonesDay.com)

15 June 2012

Copy to:
**Memery Crystal LLP**
44 Southampton Buildings
London WC2A 1AP
(DHrands@memerycrystal.com;
NScott@memerycrystal.com;
CWhitaker@memerycrystal.com )

Dear Sirs

**Excalibur Ventures LLC (Claimant) -v- (1) Texas Keystone Inc/LLC (2) Gulf Keystone Petroleum Limited (3) Gulf Keystone Petroleum International Limited (4) Gulf Keystone Petroleum (UK) Limited (Respondents)**

We refer to your two letters of 4 May 2012 concerning disclosure. Your first letter raised various questions about our client's disclosure. The second letter responded to various questions that we had raised regarding your client's disclosure.

We address matters relating to our client's disclosure below. We note that both you and Memery Crystal seek disclosure of documents that relate to our client's attempts to fund this litigation and that you seek to criticise our client and this firm for failing to provide such documents. You appear to contend that any activities associated with litigation funding are relevant to the matters in dispute because they somehow evidence our client's generic ability to raise finance (though, equally, you dismiss as irrelevant to this question the fact that our client has provided £9.5 million in cash by way of security for costs). We address this and the other points related to our client's disclosure in the second section of this letter.

As to your client's disclosure, you informed us on 4 May 2012 that you had identified further categories of potentially relevant documents for the first time. The results of your review of these documents (some 500 odd documents) were provided to us on 21 May 2012. This

UK-3062359-v3

70-40463155

CLIFFORD CHANCE LLP IS A LIMITED LIABILITY PARTNERSHIP REGISTERED IN ENGLAND AND WALES UNDER NO. OC323571. THE FIRM'S REGISTERED OFFICE AND PRINCIPAL PLACE OF BUSINESS IS AT 10 UPPER BANK STREET LONDON E14 5JJ. THE FIRM USES THE WORD "PARTNER" TO REFER TO A MEMBER OF CLIFFORD CHANCE LLP OR AN EMPLOYEE OR CONSULTANT WITH EQUIVALENT STANDING AND QUALIFICATIONS. THE FIRM IS AUTHORISED AND REGULATED BY THE SOLICITORS REGULATION AUTHORITY.

**CLIFFORD CHANCE**

CLIFFORD CHANCE LLP

production contained certain highly relevant documents that obviously should have been identified and disclosed sooner. Our review of these documents also raises further questions about the methodology that has been used to search for and disclose your client's documents. The first part of this document sets out the matters that we see as most significant in this regard and which we request be addressed as a matter of priority by way of (yet further) supplemental disclosure.

1.  **YOUR CLIENT'S DISCLOSURE.**

1.1 **NEXUS BETWEEN THE DEFENDANTS**

   1.1.1 You seem to have limited your response to matters pertaining solely to your client's business interests in Iraqi Kurdistan. Whilst we appreciate your desire to circumscribe the scope of your client's disclosure, this approach overlooks the fact that an important element of the dispute concerns the true nature and extent of the relationship between your client and the Gulf Defendants. Indeed, it is your client's pleaded position that "*Texas Keystone is not part of the Gulf Keystone group of companies*" (Texas Amended Defence, paragraph 13(a)); that "*[i]It is denied that Texas Keystone has "close ties" with the Gulf Keystone group of companies (whatever that term is intended to mean)*" and that "*[a]t the material times, the sole link between Texas Keystone and Gulf Keystone was Mr Kozel*" (Texas Amended Defence, paragraph 13(b)). Please confirm, as a general matter, that in considering whether or not documents are relevant to the matters in dispute, you have borne in mind whether or not they are relevant to the nexus between your client and the Gulf Defendants.

   1.1.2 Our concern is amplified by certain specific points in your letter. For example:

   (a) You say that in response to our previous questions about disclosure, you identified five boxes of documents in your client's possession that "*belong to Gulf Keystone*", yet you have made no attempt to search or disclose those documents. Instead, you say that your client has shipped copies of the documents to Gulf Keystone and you place the onus on them to disclose them if they deem it appropriate. Since these are documents in your client's control that, by their nature, evidence the scope and nature of your client's relationship with Gulf Keystone, it must be incumbent upon your client itself to disclose these, bearing in mind the pleaded issues.

**CLIFFORD CHANCE**  CLIFFORD CHANCE LLP

    (b) At paragraph 1.1.1 of your letter, you address the position of Dale Wissman. The disclosure you gave previously indicated that Mr Wissman had a close working relationship with several individuals at the Gulf Defendants and was involved, inter alia, in:

        (i) the approval and processing of payments by the Gulf Defendants to Texas Keystone and vice versa;

        (ii) financial control and audit processes associated with both companies; and

        (iii) evaluation of international business opportunities.

1.1.3 You have declined to carry out any further search for Mr Wissman's documents on the asserted grounds that "*he had no substantive involvement in the Kurdistan project or with Excalibur.*" This misses the obvious point that any of Mr Wissman's documents that evidence the relationship between the Defendants are potentially highly probative of the true extent and nature of that relationship. We and the Court are entitled to disclosure of all documents that relate to the overlapping and interacting business activities of Texas Keystone and the Gulf Defendants.

1.1.4 A similar point falls to be made in respect of John Taylor. You say that Mr Taylor's emails and documents are "*likely to be irrelevant to these proceedings*" because he had no substantive involvement in the Kurdistan project. On your account, Mr Taylor was employed by Texas Keystone for four years, up to October 2005. At that time (just two months before our client's introduction to the Defendants), his employment was transferred to Gulf Keystone. However, Mr Taylor continued to be based in the Texas Keystone office in Pittsburgh. In light of the pleaded position on nexus, it is obviously highly relevant to have disclosure of all documents that evidence:

    (a) The circumstances in which Mr Taylor's employment was transferred; and

    (b) The nature of the work he conducted for Gulf Keystone out of Pittsburgh (given that this apparently had nothing to do with Kurdistan).

1.1.5 In the case of invoices and inter-company payments, you complain that a search for relevant documents would be "*unnecessary and unduly burdensome*". We fail to understand how you can seriously assert this in

**CLIFFORD CHANCE**  CLIFFORD CHANCE LLP

circumstances where your pleaded position is that there were no substantial ties between the companies.

1.1.6 Precisely this issue was canvassed in detail at the Case Management Conference before Mr Justice Burton last year. We refer you, for instance, to the following exchange between Mr Justice Burton and Mr. Matovu QC:

MR JUSTICE BURTON: I didn't ask Mr Crane expressly but do you agree with the Claimant that we have got to deal with the puppeteer issue by proper disclosure on your side? The answer (inaudible)...

MR HARRY MATOVU QC: Oh yes. I understood that my learned friend suggested that all issues of disclosure go back...

MR JUSTICE BURTON: Oh yes, he was making the point about methodology but I think you have got to agree as a matter – you haven't got to but you are being asked to agree, as a matter of principle, because you haven't made this clear up to now as I understand it-

MR HARRY MATOVU QC: Yes.

MR JUSTICE BURTON: -that included in your disclosure obligation there will be disclosure in relation to the relationship between you and the First Defendant.

MR HARRY MATOVU QC: Yes. As to that, as I understand it, my learned friend wishes the date reference from which (talking together)... to go back further-

MR JUSTICE BURTON: Yes.

MR HARRY MATOVU QC: -than that which we contend for. We say December 2005 because that embraces this particular transaction.

MR JUSTICE BURTON: Yes, but you would want to go earlier than that if you are going to stave off the allegation of alter ego.

MR HARRY MATOVU QC: Well, that is my learned friend's case and I don't...

MR JUSTICE BURTON: That is why I say stave off rather than support.

MR HARRY MATOVU QC: Yes. No, no, my learned friend's case is that it has got to back further for that purpose.

MR JUSTICE BURTON: No, I am putting to you you have got to go back in order to stave off the allegation of alter ego.

MR HARRY MATOVU QC: Yes.

**C L I F F O R D**
**C H A N C E**

CLIFFORD CHANCE LLP

> MR JUSTICE BURTON: It is no good starting at the date of the transaction if the point is that the transaction was entered into by the First Defendant in order to avoid the need for the real controllers to be mentioned.
>
> MR HARRY MATOVU QC: Well, our submission is that, of course, it doesn't start at the particular transaction-
>
> MR JUSTICE BURTON: No.
>
> MR HARRY MATOVU QC: -but it goes to a period...
>
> MR JUSTICE BURTON: I have forgotten what date you want to go back to. Well, I haven't suggested a date but it should go back to something which covers the allegation. It is no good just to say the allegation is denied. That is not the point.

1.1.7   Please now confirm whether or not you are prepared fully to disclose the documents that evidence the nature and scope of the relationship between your client and the Gulf Defendants, covering the entire period agreed to following the Case Management Conference.

## 1.2   GULF KEYSTONE'S DOCUMENTS

1.2.1   You say that following our letter of 4 April 2012, your client identified five boxes of documents in its Pittsburgh office and in its "*off-site storage facilities*". Rather than search these documents and disclose those that are relevant, you say that there were shipped "*copies*" of the documents to Gulf Keystone. However, Gulf Keystone has made no mention of these documents nor, it appears, has it "*assumed responsibility*" for reviewing the documents and disclosing any that are relevant.

1.2.2   To our knowledge, these documents have not to date been reviewed by the Gulf Defendants or by their lawyers. Certainly, they have not been disclosed to us. Please explain the basis on which you advised your client that it was appropriate to surrender control over documents that were patently relevant to the matters in dispute in these proceedings, in circumstances where the consequence of that advice is that such documents have not been disclosed and now appear unlikely to be disclosed.

## 1.3   CUSTODIANS

1.3.1   Your disclosure of 21 May 2012 revealed further sources of documents that ought to have been identified and searched previously. In particular, it is apparent that Mr Frank Kozel routinely used a "hotmail" email account when conducting business connected to Texas Keystone and the Gulf Defendants

**CLIFFORD**
**CHANCE**

(see, for example, TKI00021624). We understand that (together with Todd Kozel), Frank Kozel was an officer of both Texas Keystone and the Gulf Defendants. On the basis of documents disclosed in these proceedings, we understand that he was involved in business opportunities pursued by Gulf and Texas together, including opportunities outside of Kurdistan. He is obviously a significant custodian of documents. We therefore request that Texas Keystone seek access to the fwkozel@hotmail.com account and conduct a thorough search of that account for emails relevant to these proceedings.

1.3.2   We would be grateful if you could make enquiries in order to establish whether the other officers of Texas Keystone (and in particular Mr Robert Kozel and Mr Todd Kozel) used private webmail email accounts when conducting business with or on behalf of Texas Keystone. We note that in several instances it is not possible to ascertain from the native disclosed document the precise email account used in each instance.

## 1.4   SPECIFIC DOCUMENT REQUESTS

1.4.1   We refer to paragraph 36 of Robert Kozel's witness statement, where Mr Kozel suggests that Mr Kozel purchased shares directly in Gulf Keystone, in addition to the shares held on trust for him by Mr Todd Kozel. Please could you provide us with evidence of purchase of these additional shares.

1.4.2   We refer to paragraph 67 of Mr Robert Kozel's witness statement where he mentions making the decision about whether or not to participate in the Shaikan PSC, and the terms of Texas Keystone's participation. Please can you confirm that you have searched for and that we have been provided with all documents, attendance notes, records of discussions and minutes of meetings evidencing this decision and the consultation with other board members of Texas Keystone.

1.4.3   We refer to paragraphs 66, 74, 94-96, 103, 105, 110, 115, 119, 121, 125 -128, 132 of Mr Robert Kozel's statement. Please can you confirm that you have searched for and disclosed all documents (including attendance notes and records of meetings) evidencing what was discussed between Mr Robert Kozel and Mr Todd Kozel on these occasions.

1.4.4   Please can you confirm whether the markings on document 0086316 were made by Mr Robert Kozel. Please can you confirm that all documents evidencing Mr Robert Kozel's comments on the Draft Collaboration Agreement have been disclosed.

**CLIFFORD CHANCE**

1.4.5   We refer to paragraphs 97-99, 109 and 163 of Mr Robert Kozel's witness statement where he refers to Texas Keystone's interest in new business opportunities involving the Marcellus Shale formation and considering which opportunity Texas Keystone should choose to invest in. Please can you disclose all documents:

(a)   evidencing that Texas Keystone was actively weighing where to allocate its resources as between Marcellus Shale and Kurdistan;

(b)   relating to Texas Keystone's decision not to go ahead with the Shaikan project because it decided to focus on opportunities and projects closer to home including the Marcellus Shale opportunities. In each case please disclose in particular all board minutes and board papers, internal memoranda, financial projections, correspondence and attendance notes of discussions within Texas Keystone; and

(c)   evidencing the "*continuing*" discussions that Robert Kozel was having with Todd Kozel, David Kozel and Frank Kozel in this regard referred to at paragraph 109.

Please could you also confirm whether Texas Keystone did in fact proceed with any of the opportunities that it had identified involving the Marcellus Shale formation.

These documents are relevant and disclosable as Mr Kozel's evidence suggests that the reason why Texas Keystone did not participate in the Kurdistan deal was because Texas Keystone wanted to preserve its capital for projects closer to home and in particular in the Marcellus Shale formation.

1.4.6   We refer to paragraph 101 of Mr Robert Kozel's witness statement. Please can you provide us with any documents relating to Mr Kozel's discussions with the lawyers relating to the draft transfer agreement between Texas Keystone and Gulf Keystone.

1.4.7   We refer to paragraph 115 of Mr Robert Kozel's witness statement where he mentions that he told Mr Todd Kozel that Texas Keystone's counsel would review the draft "Memorandum of Agreement" and prepared a joint bidding agreement. Please can you disclose any documents relating to these discussions in relation to these two agreements.

**C L I F F O R D**
**C H A N C E**

1.4.8 We refer to paragraph 134 of Mr Robert Kozel's witness statement where Mr Kozel refers to discussions with Mr David Kozel and Mr Frank Kozel regarding Texas Keystone becoming a party to a PSC. Please can you confirm that you have searched for and disclosed all documents, including attendance notes and records of telephone conversations or meetings evidencing these discussions and in particular any internal considerations as to the costs Texas Keystone had incurred.

1.4.9 We refer to paragraph 142 of Mr Robert Kozel's witness statement, where Mr Kozel refers to discussions regarding the terms of the possible indemnity arrangements between Texas Keystone and Gulf Keystone. Please can you confirm that you have searched for and disclosed all documents, including attendance notes and records of telephone conversations or meetings evidencing these discussions.

1.4.10 We refer to paragraphs 144 and 145 of Mr Robert Kozel's witness statement which refer to the negotiating and drafting of the first indemnity agreement. Please could you confirm:

   (a) That you have searched for and provided all exchanges between your firm and Mr Iain Patrick regarding the draft agreement. We note that the Gulf Defendants have disclosed a number of exchanges (see for example the email sent on 29 October 2007 from Rachel Allen to Iain Patrick or document GKP00006606) which your clients have not disclosed.

   (b) That you have searched for and provided all exchanges between your firm and Texas Keystone regarding this draft agreement. We note that you have already disclosed an email between Christine Raizin and Rachel Allen, copying in Iain Patrick (on 21 May 2012) sent on 26 October 2007.

1.4.11 We refer to paragraph 153 of Mr Robert Kozel's witness statement where Mr Kozel refers to discussions relating to Texas Keystone declining to exercise its option to retain its 5% interest. Please can you confirm that you have searched for and disclosed all documents, including attendance notes, evidencing these discussions.

1.4.12 We refer to paragraph 726 of Mr Todd Kozel's witness statement where Mr Kozel refers to a family meeting where Texas Keystone decided not to exercise its option under the Indemnity Agreement. Please can you confirm

**CLIFFORD CHANCE**

that you have searched for and disclosed all documents, including attendance notes, evidencing what was discussed at this meeting.

## 2. OUR CLIENT'S DISCLOSURE

### 2.1 Generally

2.1.1 In your latest correspondence you make a disingenuous complaint that our client has taken a "*selective and protracted*" approach to disclosure. This allegation is bizarre, and all the more so in circumstances where it is your client that:

  (a) treated the disclosure Orders of the Court as optional;

  (b) missed the deadline for disclosure by weeks;

  (c) tendered sworn evidence on the subject of disclosure that was unreliable, to say the least;

  (d) waited seven weeks before providing the disclosure requested by us on 2 April 2012;

  (e) has been revealed to have avoided searching for documents belonging to key custodians of documents; and

  (f) even now has adopted a selective approach to disclosure against the key issues that is contrary to the CMC Order and the very clear views of Mr Justice Burton.

2.1.2 Regardless of the baseless criticism that you have sought to level against us and our client, we have examined your further disclosure requests with a care and scrutiny that, in truth, they do not warrant. We have identified a tiny number of documents that realistically add nothing to the factual picture before the Court, have arguably no relevance to the pleaded issues and that are highly unlikely to be documents that either side wishes to have added to the nascent trial bundles. We nevertheless attach these for your perusal, as described in more detail below.

2.1.3 We remain anxious to meet and address any reasonable questions that you or the Court may have regarding our client's disclosure and are prepared to make whatever effort and to conduct whatever enquiry may be appropriate to identify any document that might potentially be relevant to the pleaded issues.

**CLIFFORD**  **CLIFFORD CHANCE LLP**
**CHANCE**

Our client is not willing, however, to waive privilege over documents created in connection with this litigation in order to yield some peculiarly indirect evidence of its capacity to raise finance. Nor is our client to make speculative enquiries to unrelated third parties in pursuit of documents that may, at best, be tangentially relevant to the pleaded issues. If you are able to identify proportionate questions to be put to identified third parties that are likely to yield documents relevant to these proceedings, we will consider such questions and, if appropriate, make enquiries of such third parties.

2.1.4 As to litigation privilege, the position is very clear. Documents relating to our client's efforts to fund these proceedings are privileged. The dominant purpose of any such communications was the pursuit of contemplated litigation. We and our client unequivocally assert this privilege. Moreover, we understand no basis on which these documents are relevant to the matters in dispute in these proceedings. Latterly, it is your client's pleaded case that Excalibur could not have funded its obligations under the Collaboration Agreement. You seem to be suggesting that any effort made by Excalibur to fund this litigation has probative value in establishing whether or not Excalibur would have been able to raise funds in the quite different circumstances of funding a valuable and acknowledged interest in the PSC licences.

2.1.5 The remainder of this letter addresses the "outstanding requests" referenced in your letter of 4 May 2012, in the order in which you asked them.

## 2.2 Crowell & Moring

2.2.1 At no time was there any engagement letter between Excalibur and Crowell & Moring. Mr Paul Behrends was and is not either an agent of or a legal adviser to Excalibur Ventures or Mr Rex Wempen. Mr Behrends and Mr Wempen have been friends from many years and merely decided to work together. We have spoken with Mr Behrends who has informed us that, he is unaware of any further categories of documents that might be relevant to the matters in dispute. He pointed out to us that he and Mr Wempen had been friends for a number of years and that he had frequently "helped out" Mr Wempen in relation to a range of matters, most of which are unrelated to Kurdistan or any of the matters in dispute.

2.2.2 In 2008, in contemplation of litigation, Mr Wempen engaged in discussions with Crowell & Moring with a view to potentially engaging the firm as litigators to pursue these proceedings on Excalibur's behalf. We understand

**C L I F F O R D**
**C H A N C E**

CLIFFORD CHANCE LLP

that Mr Behrends introduced Mr Wempen to a litigator at his firm, Dana Contratto. Mr Contratto and Mr Wempen corresponded in relation to the contemplated litigation but, ultimately, Excalibur did not formally engage Crowell & Moring as counsel. For the avoidance of doubt, it is Excalibur's position that any communication between it and Crowell & Moring that was made in contemplation of this litigation is privileged.

2.2.3   Nonetheless we have searched for correspondence between Mr Rex Wempen and Mr Behrends in our client's possession. Any relevant, responsive correspondence will follow next week.

2.3 **Strategic Venture Capital ("SVC") & Prime Natural Resources ("PNR")**

2.3.1   Our letter of 14 May 2012 merely elaborates on the point made in our letter of 8 March 2012. We have disclosed a number of documents relating to negotiations with SVC and PNR already. We are withholding certain other documents on the grounds of privilege, as set out in our 14 May letter.

2.4 **Correspondence between Rex Wempen and Eric Wempen in the period October to 6 November**

2.4.1   We have conducted a search for all documents dated between 1 October 2007 and 6 November 2007 and found no further emails, correspondence or documents passing between Rex and Eric Wempen. We are not asserting privilege over documents responsive to this request.

2.5 **Redacted documents**

2.5.1   The documents referred to in your first paragraph are privileged as they were made in contemplation of future litigation with the Defendants regarding Excalibur's interest in the fields, including communications with lawyers or documents exchanged internally for the dominant purpose of seeking legal advice and internal assessments of the settlement discussions for the purpose of seeking legal advice.

2.5.2   In particular, documents 17104 – 17122 are also protected by common interest privilege in relation to contemplated proceedings against the Defendants as at the date these communications were sent.

2.5.3   Document 22341 was disclosed in unredacted form by mistake, as must have been immediately obvious to you. The document should be considered privileged and we will ensure that only a redacted version of the document

**C L I F F O R D**
**C H A N C E**                                                    **CLIFFORD CHANCE LLP**

appears in the trial bundles. The document is a confidential document in which privileged communications are reproduced or otherwise revealed. We are surprised by your assertion that there was no basis on which to redact the documents.

## 2.6 Documents said to be unavailable/not within Excalibur's control

2.6.1 As mentioned above, in response to request 1.1, Paul Behrends, in his capacity as a personal friend of many years of Mr Rex Wempen, contacted China Petroleum on our client's behalf. Crowell & Moring was not involved or engaged by our client to approach China Petroleum. There is no agency relationship between Excalibur and either of Paul Behrends or Crowell & Moring.

2.6.2 Given the close friendship between Mr Behrends and Mr Wempen, it is disproportionate to ask Crowell & Moring for documents exchanged between them as the vast majority of documents are likely to be of a personal nature and irrelevant to the proceedings. If you have discrete and appropriate questions to be put to Mr Behrends regarding his documents, we will consider these and take them up with Mr Behrends as appropriate.

## 2.7 Missing Correspondence

2.7.1 Our client has not disclosed the correspondence missing and referred to in Schedule 1 of your 10 February letter because it is no longer in its possession.

## 2.8 Documents "to be addressed in evidence"

2.8.1 Petition filed by Excalibur with the KRG on October 8, 2008

We have not yet been able to locate the final petition filed but searches are ongoing.

2.8.2 Our client confirms it does not possess any further correspondence with Mr Talabani in relation to the Petition.

## 2.9 Registration to do business in Kurdistan

2.9.1 There is no pleaded issue in relation to registration to do business in Kurdistan and the relevance of this question to the pleaded issues has not been explained. To our knowledge, the matter only arises in the context of a letter that was "reconstructed" by Mr Kozel in 2009 and then backdated to give the

**CLIFFORD CHANCE**

appearance of a letter prepared in 2007. If you are advancing the same argument as that "reconstructed" by Mr Kozel in 2009 (namely, that there was some problem associated with the fact that Excalibur was not registered in Kurdistan) then please advise us on where and how this is reflected in your pleadings. For the avoidance of doubt, we do not in any way accept that the "reconstruction" euphemism accurately reflects what transpired in relation to this episode.

2.9.2 As matters stand, this issue is irrelevant to the pleaded issues and (as with most of your requests), it does not constitute a legitimate or relevant specific disclosure query. We can nevertheless confirm that Excalibur was not formally registered in the manner Mr Kozel described in his fabricated letter and that accordingly no documents relating to such "registration" fall to be disclosed.

2.10 **Documents which relate to litigation funding and/or funding of Excalibur's alleged interest**

2.10.1 Any communications between Excalibur or its legal advisors and litigation funders are communications which came into existence for the dominant purpose of conducting or aiding the conduct of litigation and are therefore covered by litigation privilege. Such documents are plainly privileged and we unequivocally assert the same. It is obvious that disclosure of such documents would reveal the legal advice given to our clients and would disclose our client's views of the strengths of its case. It is obviously inappropriate that such documents should be disclosed and we are surprised that you are persisting in your attempts to argue otherwise. This was the point made in our previous letter to you.

2.10.2 Credit Suisse has not provided any of the other services identified in Section 1 of the Credit Suisse Engagement Letter, but has instead provided advice on matters related to these proceedings and as such is covered by litigation privilege.

2.10.3 Our client confirms that no documents were provided to Credit Suisse in connection with Section 2 of the Engagement Letter.

2.10.4 In response to previous requests, there are no arrangements in place between Riata Management and our client. Documents relating to negotiations between Riata Management and our client are protected by litigation privilege. As

**C L I F F O R D**
**C H A N C E**

negotiations were not finalised, no letters of credit were ever provided by Riata Management.

2.11 **Correspondence with other potential investors**

2.11.1 Our 14 May letter was part of a chain of correspondence, which began with your request on 10 February that "all documentary communications evidencing Excalibur's dealings with the potential investors described at paragraphs 14(a) – (e), (m) and (g) – (j) of Excalibur's RFI response dated 7 June 2011" be disclosed.

2.11.2 Our answer in our letter of 14 May 2012 implicitly refers to the RFI which was the basis of the original request in this long chain of correspondence on the issue. As such, our answer was that searches against all of the potential investors within the time frames mentioned in the respective RFI paragraphs revealed no further documents. We apologise if this was not clear.

2.11.3 You will note that the additional documents relating to funding for Excalibur's participation in the development of the fields in Kurdistan after the PSCs were signed are exchanges between Mr Rex Wempen and Mr Talal Al –Ghalib, of Gulf Finance House. Mr Talal was not mentioned in paragraph 14 of the RFI. We have since become aware of this approach and so the relevant documents were disclosed to you on 29 May 2011 in accordance with our ongoing disclosure obligations.

2.11.4 As you will know, our disclosure has been reviewed by our lawyers. In our responses to your and Memery Crystal's letters we have conducted targeted searches and have disclosed any responsive documents we have found.

2.12 **Washington Meeting Documents**

2.12.1 Our client has confirmed there are no records of the meetings, contemporaneous notes or attendance note or any further documents evidencing the meetings or their outcome. It does not follow that as a result, our client no longer remembers that these meetings occurred or that he should not mention these meetings in evidence.

2.12.2 You should have no problem with this position. Despite your client's alleged status as a substantial oil company capable of meeting the allegedly stringent requirements of Article 24 of the Kurdish Oil and Gas Law, we are informed by Mr Robert Kozel that at Texas Keystone "*we often make decisions in a fairly informal way...and we do not document every decision in notes or*

**CLIFFORD**
**CHANCE**
CLIFFORD CHANCE LLP

*minutes*" (see paragraph 17 of the witness statement of Robert Kozel). As to the ability to recall meetings, we are informed that Mr Todd Kozel was able to recall from memory the precise content of a letter sent some two years previously.

2.13 **Documents pertaining to the Thames Chesapeake Fund and the Iraq Recovery Fund**

   2.13.1 We confirm funds were not transferred either to the Iraq Recovery Fund or to the Thames Chesapeake Fund.

2.14 **Letter from Congressmen (Rohrabacher and Gohmert) to KRG dated 24 July 2008**

   2.14.1 This letter was disclosed to you on 29 May 2012. Please see document with begbates 0037292.

   2.14.2 We do not understand your complaint about an alleged failure to provide lists of supplemental disclosure. Each disclosure that we have made in these proceedings has been accompanied by an Excel load file that lists every document being disclosed, together with relevant associated metadata. There is simply no reason to have this data transposed into a hard copy document (something which you could easily do, should such a version be required). In this instance, we have conducted this simple conversion for you and a list will be sent to you next week. However, if and to the extent our client makes further disclosure in these proceedings, we intend to carry on with our existing practice of providing electronic disclosure with an appropriate load file.

   2.14.3 There is no basis within the context of a specific disclosure request for us to confirm or deny whether our client ever contemplated litigation against Dabin. Obviously, if and to the extent such litigation was contemplated, documents that might have been created with the dominant purpose of any such contemplated litigation would be privileged.

2.15 **Excalibur's employees**

   2.15.1 NESI is not an organisation but is instead the name given to the survey of Iraq undertaken in 2004. Our client is no longer in possession of documents relating to who was employed to carry out work on NESI. Without these records, which our client does not possess and which appear to no longer exist, our client is unable to provide you with a Schedule of Employee Information.

**C L I F F O R D**
**C H A N C E**

Finally, we enclose a hard copy of the final draft letter to the Hon. Qubad Talabani, which was exhibited to Mr Rex Wempen's statement.

We do not consider that there are any further legitimate queries regarding our client's disclosure but we will consider any further specific questions that you may have.

Yours faithfully

*Clifford Chance LLP*

**Clifford Chance LLP**