```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

IN RE:                           :  No. 3:12CV-850 (SRU)
                                 :  915 Lafayette Boulevard
                                 :  Bridgeport, Connecticut
                                 :
                                 :  October 5, 2012
TEXAS KEYSTONE, INC.             :

- - - - - - - - - - - - - - - - x

                   TELEPHONE CONFERENCE

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

   FOR TEXAS KEYSTONE, INC.:

        JONES DAY
             500 Grant Street, Suite 4500
             Pittsburgh, Pennsylvania  15219
          BY:  PETER D. LAUN, ESQ.
               JOHANNA MIRALLES, ESQ.

        CARMODY & TORRANCE
             195 Church Street
             P.O. Box 1950
             New Haven, Connecticut 06509-1950
          BY:  STUART C. JOHNSON, ESQ.

   FOR EXCALIBUR VENTURES LLC:

        CLIFFORD CHANCE US LLP
             31 West 52nd Street
             New York, New York  10019
          BY:  JAMES D. MILLER, ESQ.
               MEGAN FARRELL, ESQ.

        MAYA MURPHY PC
             266 Post Road East
             Westport, Connecticut  06880
          BY:  ROBERT L. KEEPNEWS, ESQ.
```

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

```
 1                    (3:00 O'CLOCK, P. M.)

 2              (Whereupon the following session was held in

 3    chambers telephonically.)

 4              THE COURT:  Stefan Underhill.

 5              MR. LAUN:  Good afternoon, Judge Underhill.

 6    This is Pete Laun from Jones Day.  If I did this right I

 7    should have all counsel on the phone.  So hopefully we can

 8    go through a quick roll call, make sure we've got

 9    everybody here.

10              THE COURT:  Great.

11              MR. KEEPNEWS:  This is Bob Keepnews from Maya

12    Murphy for Excalibur.

13              MR. MILLER:  And Jim Miller and Megan Farrell

14    from Clifford Chance for Excalibur.

15              MR. JOHNSON:  This is Stuart Johnson from

16    Carmody & Torrance for Texas Keystone.

17              MS. MIRALLES:  And this is Johanna Miralles from

18    Jones Day.

19              THE COURT:  I'm sorry, one more time please?

20              MS. MIRALLES:  That was Johanna Miralles,

21    M-I-R-A-L-L-E-S.

22              THE COURT:  Very good.

23              MR. LAUN:  And again, this is Pete Laun from

24    Jones Day also for Texas Keystone.

25              THE COURT:  Okay, great.  We are on the record,
```

1    so if would be very helpful to my court reporter if you

2    could identify yourself when you start speaking, please.

3         Let me begin with by setting forth what I think

4    we have to do today and then we can go from there.  It

5    seems to me that there are potentially five matters to

6    take up.

7         The first I hope is quite simple.  Docket Number

8    29 is a motion for status conference and in camera review.

9    That was filed August 17th.  I believe that the relief

10   sought in that motion has already been, in effect been

11   provided, and, therefore, it would be my intention to deny

12   that motion as moot.  Any objection to doing that?

13        MR. LAUN:  For Texas Keystone, Pete Laun

14   speaking, none here.

15        THE COURT:  All right.  Well, that's your motion

16   so I'm going take that as a no.  So Number 29 is denied as

17   moot.

18        The rest are not quite so easy.  We have, I

19   think this next thing to take up would be the motion to

20   stay proceedings, which is Number 56.  I have reviewed

21   that motion, the supporting papers and the opposition

22   papers.

23        Once that is decided, the next logical thing to

24   take up would be the motion to adopt Special Master report

25   and order, number two, which as a practical matter brings

```
1    along with it the Motion to Compel that is the subject of

2    that report.  Those are Numbers 51 and 18 of the docket

3    sheet.

4            And then the last thing that we may want to talk

5    about today is, Mr. Silvestri has filed a Special Master

6    report and order number three, that deals with the

7    allocation of fees.  I have reviewed that report, and if

8    folks are prepared to take it up or believe it's

9    appropriate to do so, then we'll probably take that up

10   last.

11           So I think the next thing on the list would be

12   the motion to stay proceedings.  Mr. Miller, are you going

13   to argue that?

14           MR. MILLER:  Yeah.

15           THE COURT:  I mean --

16           MR. MILLER:  I will do that.

17           THE COURT:  -- do you wish to be heard?  I've

18   read the papers, and what I often do --

19           MR. MILLER:  Well, I think it might be helpful,

20   Your Honor, if I just sort of lay out where things

21   currently stand --

22           THE COURT:  Okay, that would be great.

23           MR. MILLER:  -- per, you know, the filing most

24   recently that Texas Keystone made an hour or so ago.

25           If I understand this correctly, and Pete Laun
```

1    will correct me if I don't, what Texas Keystone is
2    offering is that there will be no actual production of
3    documents from Excalibur's privilege log until the Court
4    in London decides the issues that need to get decided over
5    in London.  That is conditioned on Texas Keystone does
6    want to go ahead and have this Court decide the pending
7    issues, whether it's the stay motion or our objection to
8    the Special Master's report.
9         At least in terms of the proposal that there
10   will be no production until what happens in London needs
11   to take place and does happen, we're happy that we've
12   gotten there because that's at least an acknowledgment
13   that at the end of the day it's the Court in London that
14   ultimately has to make decisions about privilege and
15   admissibility for the purposes of the trial that's
16   starting on Monday.
17        But our position -- and I was able to speak,
18   there's been some correspondence this morning from Jones
19   Day in London from Texas Keystone, I was able to speak to
20   my colleagues in London, and I can't say that we're out
21   and out disagreeing with that proposal, but our position I
22   think at this point is consistent with our stay, which is
23   for two reasons we really just don't see that the Court
24   needs to proceed and review the objections that we've put
25   in on the Special Master report.

```
1              Two reasons.  We think that, that the basis of
2    this proceeding has been in violation of U. S. procedural
3    rules -- I'm sorry, U. K. procedural rules.
4              Now, there's a debate on that, but nonetheless,
5    going ahead would perhaps condone that violation and, at a
6    minimum, we should have the U. K. Court, the London Court
7    weigh in as to that issue.  And so that's one reason not
8    to go ahead and pick up the objections of the Special
9    Master report.
10             The other reason is, you know, frankly, our
11   bottom line position, and I think this has been, you know,
12   borne out by our papers, as at the end of the day, this
13   does not assist, decisions on the special master report
14   will not actually assist the London Court in anything
15   that, you know, the purpose of Section 1782 is ultimately
16   to provide a vehicle for litigants in foreign proceedings
17   to come here, obtain discovery -- but, you know, the
18   bottom line of it is it needs to assist the proceedings,
19   the foreign proceedings.
20             And it's at this point, and to some extent Texas
21   Keystone acknowledges this now, at some point it's
22   irrelevant what the privilege issue say on -- use the UBS
23   policy as an example -- what the outcome of that is here.
24   You know, Texas Keystone has now said in its most recent
25   filing and the correspondence that was attached, that they
```

1  recognize that that's ultimately an issue that will matter

2  for the London Court to decide.

3          So, deciding that issue here, we just don't, we

4  don't see why the Court should, should extend any

5  resources towards that or why the parties should continue

6  to put resources toward that.

7          And to finish my thought on that, again on the

8  UBS policy, I can give an impassioned argument as to why I

9  think the decision on the UBS policy effectuating a waiver

10 of attorney-client privilege is not a good decision.  And

11 if we lose on that, which I, again, don't think would

12 assist the Court in London in any event, if we lose on

13 that, Judge, we're going to ask for a stay of the

14 production, you know, pending an appeal of that.

15         This is, I think, a very important issue that

16 has a lot to do with, you know, privacy, with our

17 understanding of today's world in terms of email use, you

18 know, it's something which, amongst some other objections

19 we've made, you know, should be appealed to the extent we

20 lose, and we should not be in a position of having

21 produced documents here while that appeal is pending when,

22 at the end of the day, it all doesn't really matter to the

23 London proceeding.  So that's my overall pitch.

24         THE COURT:  All right.  Let me ask a couple

25 questions.

1          First off, if I don't reach the Motion to

2    Compel-slash-the Special Master's report, and there's not

3    an order from this Court to produce documents, why would

4    the, why would the British Court have reason to reach the

5    question of privilege under British law?  Presumably the

6    parties have obtained whatever documents they can obtain

7    in England, and the reason we have a 1782 in the first

8    place is because there's a need to obtain other documents

9    which will never come before the British Court unless and

10   until there's an order here that they be produced.

11         So, what am I missing about that?

12         MR. MILLER:  Yes, I see sort of the potential

13   procedural hiccup there.  But at the end of the day, what

14   we're asking for is the U. K. Court to take the privilege

15   log that was created here and to review the issues under

16   U. K. law as between Excalibur and Texas Keystone over

17   there.  So I don't think it needs an order one way or the

18   other here on the Motion to Compel for the Court to simply

19   pick up on the, I think around 215 documents that are on

20   the logs, you know, to pick up the argument as we would

21   have hoped more, frankly, months ago to pick up the

22   argument and the review and make its own decision.

23         We are at the point where the documents have

24   been identified, they've been collected, and so I don't

25   think that it requires an order here one way or the other

1    that will -- in order for the Court in London to do its

2    work.

3            THE COURT:  Well, I guess I'd see it

4    differently.  I don't see how an order here to -- that a

5    particular document is or is not privileged is going to

6    step on the toes of the English Court in any way.  They

7    are still going to have to decide under their own law

8    whether the documents are privileged and can be used over

9    there, or whether they are, even if they are not

10   privileged, even if they are admissible, and, finally,

11   whether there has been any improper use of documents from

12   that litigation in terms of any orders to kind of control

13   their proceedings.

14           None of those issues are affected by a

15   determination of whether these documents are either

16   privileged or protected by work product under U. S. law

17   which seems to be, as I noted just a moment ago, seems to

18   be the starting point for even the need for the British

19   Court to reach any of those issues.

20           MR. MILLER:  Well, Your Honor, I don't, I don't

21   think it's the starting point for the U. K. Court at all.

22   The U. K. Court needs to simply, based on U. K.'s law,

23   make its own decision.

24           THE COURT:  No, no, no, but I think -- maybe

25   we're not, maybe we're not understanding each other.

1          MR. MILLER:  Uh huh.  (Affirmative.)

2          THE COURT:  What I'm saying is if there's no

3    order in this Court to produce these documents, there is

4    no need for the British Court to decide privilege because,

5    you know, Texas Keystone is not going to have access to

6    them, presumably.  In other words, if these were, if these

7    were producible in some form in the English litigation,

8    the privilege claim would have come up there already.

9          MR. MILLER:  Uh huh.  (Affirmative.)

10          THE COURT:  The fact that it hasn't come up

11    means, unless and until there's an order from this Court

12    they be produced, there is no reason for the British Court

13    to even consider whether they are privileged under British

14    law.  Why would you decide an issue that's advisory?

15    There's no, there's no order that anybody, that Texas

16    Keystone receive these documents from anyone.

17          MR. LAUN:  Your Honor, if I may, this is --

18          MR. MILLER:  Well, the documents -- I'm sorry --

19    the documents are in the control of Clifford Chance,

20    counsel for Excalibur, both here in New York, in the

21    States and London, so if it's an issue of the Court now, I

22    mean if it's an issue of the Court's authority in London

23    as to whether it can compel a production, they can, the

24    Court now can compel that production from us, from

25    Excalibur.

```
 1              THE COURT:  Right.

 2              MR. MILLER:  We now have the documents.

 3              THE COURT:  Sometime in the middle of the trial,

 4    which is starting Monday.

 5              MR. LAUN:  Your Honor, this is --

 6              MR. MILLER:  Oh, but, but, but one way or

 7    another, the documents -- one way or another, the issues,

 8    first of all, still need to be decided.  If you were

 9    today, for example, to order the production of these

10    documents, which, by the way, Texas Keystone has said is a

11    step that they are willing not to take pending a decision

12    by the Court in London about privilege admissibility.

13              If you were to order the production of those

14    documents today, the first thing we would do would be to

15    request a stay of that order pending an appeal.  And we

16    would, you know, in that respect, you know, that order,

17    that production, therefore, gives Texas Keystone access to

18    documents we say it otherwise should not have and so it

19    could be ice in Winter if we end up with -- they may not

20    be ultimately used in a trial in London but they are

21    certainly going to end up being used for purposes of

22    litigating that case even if we have the London Court

23    decide that these documents should not have been produced

24    in the first place.

25              THE COURT:  No, but I think -- aren't we past
```

1    that?  Aren't we to the point where the letter from Jones

2    Day that was attached to the opposition raises the idea of

3    either having those documents maintained by the Special

4    Master or being delivered to Ann Rubin who is not involved

5    in the English litigation?

6            In other words, if I order them to be produced,

7    conditioned upon their delivery and their being held in

8    escrow by Ann Rubin pending an order, pending your

9    opportunity to argue to the British Court they shouldn't

10   be produced, I mean all the harms that you are suggesting

11   would follow wouldn't follow.

12           MR. MILLER:  Yes, so, Your Honor, specifically

13   on that point, our creating a production that conforms to

14   the Special Master's report and putting that in, let's

15   call it escrow, pending decisions by London, I think is

16   doable.  We would not agree to Ann Rubin for reasons I

17   don't want to get into but we would certainly agree to

18   Mr. Silvestri.  That might be doable, but it does leave

19   open the issue does this Court still need to ultimately

20   decide the objections to the Special Master for the Court,

21   and on that issue, which is the one that I've really been

22   focusing on the most, our answer to that is no.

23           We can take these documents, we can put them in

24   escrow with Mr. Silvestri, and then, as we've been, you

25   know, urging you know, all along, let the Court in London

1    ultimately make decisions about what does or does not

2    happen to those documents.

3            The Court will have to make those decisions one

4    way or the other, so you know, so yes, we can create a

5    production that conforms to the Special Master's of the

6    Court, but we still have the issue of does the Court

7    continue this proceeding in the face of our argument that

8    it's a violation, that the proceeding is occurring in

9    violation of English procedural rules, and does it

10   continue to proceeding in the context where there really,

11   where it really is not an assistance to the Court in

12   London.

13           MR. LAUN:  Your Honor, Pete Laun, if I may be

14   heard on just a couple of issues, and I'll be quite brief.

15           THE COURT:  Sure, yes.

16           MR. LAUN:  First, procedurally, how we got here,

17   Your Honor's statement of the need for an order is in my

18   view completely on track because how we got here was that

19   these are UBS's documents, they are not Excalibur's

20   documents, and Excalibur took the position early on in the

21   London proceeding it did not control and could not produce

22   these documents.  We took that as face value.

23           And so how we got to the 1782 in the first

24   instance was that Clifford Chance took the position that

25   Eric Wempen, who was then still an employee of UBS,

1   couldn't and wouldn't access those documents, even though

2   he accessed some documents, apparently from his UBS

3   server, and produced them.

4          So we started down the 1782 road following

5   Clifford Chance saying we can't and won't produce these;

6   hence, how we ended up in your court.

7          MR. MILLER:  But on that point --

8          MR. LAUN:  Let me finish.

9          MR. MILLER:  On that point -- but on that point,

10  just quickly, we now do have control of the documents.

11  There's no way we can duck a court order, whether it's

12  here -- "we" meaning Excalibur at this point -- a court

13  order here or, more importantly, a court order in London

14  to produce those documents.

15         MR. LAUN:  And on that point, let me take a

16  detour on that point which is a very material one, is that

17  Clifford Chance has had these documents for several months

18  and if them wanted to throw themselves in front of the

19  English Court and have the Court decide this issue, they

20  could have done it months ago.

21         You know, as we point out in our response to

22  their motion to stay, the timing of all of this is very

23  suspect with the trial beginning on Monday, because

24  apparently Clifford Chance had control of these documents

25  since UBS gave them to them months ago and could have made

1    an application or done lots of other things in London,

2    none of which they've done.

3           What they've done is chewed on some

4    correspondence but they've not taken even the most basic

5    step to address this issue with the London Court.

6           MR. MILLER:  And just quickly on that point, as

7    you know, we have a difference of opinion that, you know,

8    we've taken the position these documents are privileged

9    and that you have never sought redress in front of the

10   London Court, even though as of today you acknowledge that

11   ultimately the London Court is going to have to decide

12   these issues.

13          MR. LAUN:  Well, so --

14          THE COURT:  Well, okay --

15          MR. MILLER:  Our position on that, and we've

16   taken it in the context of briefing here and

17   correspondence, is that it was incumbent on you to take

18   the next step.

19          MR. LAUN:  Yeah, I don't know how we move for

20   production of documents, you know, that haven't been

21   ordered produced yet.  I mean that's sort of a bullion

22   loop as far as I'm concerned.

23          MR. MILLER:  Well, as you just agreed to, the

24   documents have been in our control.

25          MR. LAUN:  So you told me today.

1          But, in any event, Your Honor, I think the issue

2     is, you know, why wouldn't the British Court reach this

3     issue, which is the question you asked.  As Your Honor

4     pointed out, the documents apparently weren't obtainable

5     in London, they weren't obtained there.  The whole issue

6     here in terms of what UBS produces or doesn't produce,

7     it's a U. S. entity that is only under the subpoena power

8     of this court and, therefore, what it has to produce or

9     doesn't have to produce in our view, and this has been the

10    briefing from day one, is solely under the control of this

11    Court under 1782.

12         And then, it seems to me that the proper step is

13    just what Your Honor said, which is this Court orders to

14    be produced whatever it orders to be produced.  We

15    disagree with Clifford Chance whether or not, you know,

16    it's really proper for the U. K. Court to revisit that.

17    As matter of accommodation and to demonstrate our good

18    faith, we said, sure, if you want the Court ultimately

19    take whatever documents that this Court orders to be

20    produced and review them before we've seen them to ensure

21    we're not getting some unfair advantage, we're content

22    with that.

23         But the first step in that process is an order

24    for production which will then tell the U. K. Court and

25    the parties exactly what documents are in issue and,

1    therefore, what documents the U. K. Court will have to

2    decide as far as admissibility and privilege.

3         To us, that seems like the proper procedure

4    because it finishes what we started, which was a 1782

5    proceeding initiated when Clifford Chance and its client

6    said they didn't have control of the documents.

7         THE COURT:  Well, yes, I'm going to deny the

8    motion to stay.  It seems to me that this is an

9    appropriate 1782 proceeding.  The documents are ones that

10   by definition haven't been produced in the London

11   proceeding.  They -- I should note that I have the ex

12   parte documents, the documents submitted for in camera

13   review, and I have not had a chance to read them in their

14   entirety but I've compared them against the Special

15   Master's report, they appear to be documents that are

16   going to be pertinent, could be pertinent at least, and,

17   therefore, it seems to me the purposes of 1782 are in fact

18   being met, and nothing that I do today is going to

19   interfere, in my view, in any way with what the British

20   Court can or needs to do.

21        That is, I'm not deciding issues of English law;

22   I'm not deciding issues of privilege; I'm not deciding

23   issues of admissibility; I'm not deciding issues of

24   whether the procedures of the English Court have been

25   abused in any way.  I'm simply deciding whether these

```
1    documents are appropriately produced or, to the contrary,

2    whether they are protected by either the attorney-client

3    privilege or by the work product doctrine under U. S. law.

4         And it seems to me the way to handle that is in

5    the event that some or all of these documents are ordered

6    to be produced, they should be held by the Special Master

7    until October the 12th -- the later of October the 12th

8    or, assuming that a motion is filed in the English Court

9    to seek to protect them from disclosure on the ground of

10   privilege, until that Court has a chance to resolve that

11   motion.

12        If no motion is filed by the 12th, then the

13   document should be turned over, but that will protect --

14   that will give the opportunity to Excalibur to raise in

15   the English Court any claims that it has that form the

16   basis of its motion to stay here, and I think that's the

17   appropriate, that being England, is the appropriate place

18   for those issues to be raised.

19        MR. MILLER:  Your Honor, Jim Miller again for

20   Excalibur.

21        THE COURT:  Yes.

22        MR. MILLER:  So, I'm sorry, I missed -- I got

23   the October 12th date but I missed the later of what two

24   things for October 12th?

25        THE COURT:  It's the later of that -- the close
```

```
1    of business on October the 12th.  In other words, if we
2    get to October 13th, and you haven't filed a motion with
3    the Court, that then the documents will be turned over.
4         If you have filed a motion with the Court in
5    England on or before October 12th, to protect these
6    documents on a claim of privilege or otherwise, then the
7    later will be when the Court over there decides that
8    motion.
9         MR. MILLER:  So, are we to understand then that
10   you are adopting the Special Master's recommendations?
11        THE COURT:  Well, that's what we're going to
12   take up next.
13        MR. MILLER:  Okay.
14        THE COURT:  Yes, but I'm setting up a
15   procedure -- in response to the motion to stay, I'm
16   setting up a procedure that I believe will protect the
17   interests that you've identified in your motion, but also
18   allow this Court to reach the merits of the 1782
19   proceeding.
20        MR. MILLER:  Okay, understood.  Thank you.
21        THE COURT:  All right.  So why don't we take up
22   then the two related questions of the motion to adopt the
23   Special Master report, Order Number Two, and the Motion to
24   Compel, which is really the underlying motion.
25        Mr. Laun, do you want to begin?
```

1              MR. LAUN:  Sure.  And this has been obviously

2       quite thoroughly briefed so I don't want to repeat that

3       which is set forth in the papers in gory detail.

4              But, in short, our arguments on the motion to

5       compel and, frankly, the points we make in response to

6       Special Master Silvestri's report, are quite

7       straightforward and, frankly, the briefs we submitted to

8       Special Master Silvestri as well.

9              Eric Wempen, in-house lawyer for Excalibur,

10      there's no attorney-client privilege between him and his

11      brother, and he is another principal, although a fairly --

12      I think a far less involved one in Excalibur.  He's not

13      their lawyer.  If he was, as the Special Master points

14      out, that raises some issues about practicing law in

15      Connecticut but, in any event, it is clear he was a

16      principal in Excalibur but he was not their general

17      counsel, in-house lawyer, so our position remains that

18      there is simply no privilege.

19              That is, it's easy enough to figure that out but

20      it's even easier to figure out because in all of this

21      briefing going back months and months, there's not one

22      piece of evidence supporting the fact that he was their

23      lawyer.  There's no affidavit, there's no record evidence,

24      there's absolutely nothing supporting the fact that Eric

25      Wempen was acting as Excalibur's lawyer.

1          I mean the way you do that is, as the case law

2     makes crystal clear, is to submit an affidavit and there's

3     been so such thing submitted.

4          Then, to turn to the other points, there are a

5     series of points that we pointed out.  One is the UBS

6     server issue, and obviously you have a situation where

7     Eric Wempen, who was then employed as a full-time lawyer

8     at UBS, was essentially running a business during a

9     business day using the UBS email system.

10         The email system makes crystal clear, and every

11    version of it makes crystal clear that an employee doing

12    personal business using UBS's system has no expectation of

13    privacy and that the documents are those of UBS and not

14    his.  In our view, crystal clear, that you would start by

15    concluding that that is almost certainly going to be a

16    waiver of both attorney-client privilege and, in most

17    circumstances, work product and that's what it was.

18         And in addition to him using it throughout 2007

19    and 2008 for these purposes, even after anticipating

20    litigation, they claim in late 2007, and really continuing

21    on past filing lawsuit in December of 2010, and a year

22    and-a-half past that into 2012, Mr. Wempen made, as far as

23    we can tell and as far as the evidence shows, no effort

24    whatsoever to segregate, protect or otherwise ensure that

25    these documents weren't accessible by others.

1          And that obviously is one of the factors that

2    the courts have found significant in reviewing whether or

3    not using a third party email system is a waiver or not.

4          And then on the last point, which is waiver by

5    selective production, that's where the sort of gory detail

6    part arises.  We submitted a number of examples, exemplar

7    documents of waiver by selective production.

8          It's clear that Excalibur has sort of produced

9    in London and from UBS that which it wanted to and

10   withheld other things.  As the Special Master found, there

11   are a number of documents that UBS produced, other

12   versions of which, over which they claim privilege, the

13   same with the London proceeding, and so on.

14         As we noted in our papers, some evidence of this

15   is of the 200 or so documents they initially claimed

16   privilege over, when Judge Kravitz ordered them to produce

17   a privilege log that was proper, that actually described

18   the documents in reasonable detail, all of a sudden 40 or

19   so documents came flying out and privilege claims were

20   removed.

21         And so what we can see is there are obvious some

22   kind of overbroad -- they kind of overbroad swath of both

23   privilege and work product, and in our view the Special

24   Mass did the only thing you can do under such

25   circumstances, which is to go through the documents one by

1    one, figure out whether they have a valid or reasonably

2    grounded privilege claim.  We thought the in camera review

3    was completely appropriate.  Obviously we can't see the

4    privilege documents so we don't know what he was looking

5    at when he made those determinations, it's awfully hard

6    for us to second-guess them, but from reading the report

7    and from reading the findings, we could see nothing with

8    the report that suggests that he'd done anything other

9    than what -- the best job he could of determining what was

10   and wasn't privileged, and what was or wasn't waived by

11   selective production.

12         So, from our perspective, both on the motion to

13   compel and the ultimate resolve as carried through in the

14   Special Master's report, we think he did the best job a

15   Court can do and the report should be adopted.

16         MR. MILLER:  Your Honor, just to run down the

17   points that Mr. Laun made, hopefully quickly, in terms of

18   whether the attorney-client privilege between Mr. Wempen,

19   Eric Wempen, and Excalibur has been established or not,

20   our position is the documents demonstrated Mr. Wempen, a

21   lawyer, was providing legal device to Excalibur in

22   anticipation of litigation, you know, prior to the hiring

23   of external counsel.

24         And it's important to note, to keep in mind,

25   that most of the communications on the log do, in fact,

1    involve external counsel, either by direct communication

2    or, or reflective communication.

3          And so, to the extent that it's question of not

4    establishing the attorney-client relationship in the first

5    instance, you know, that should be, you know, limited to

6    those documents where our basis for claiming privilege was

7    Eric Wempen's involvement as in-house counsel but not for,

8    on the log that are identified as external or involving

9    external counsel.

10          That's one.  As far as the UBS server issue

11    goes, you know, our overall position on that is, setting

12    aside UBS -- I mean on the face of the UBS policy, its

13    purpose is, in order to protect UBS's interests, not

14    become a vehicle for third party discovery, and in an

15    instance that has nothing to do with UBS.

16          And so, in that context and in the context of

17    2007 and the way people use their email, in that context,

18    it was reasonable for Mr. Wempen to believe that he had an

19    expectation of privacy over those emails.  That's not a

20    waiver, a wholesale waiver of external -- of

21    attorney-client privilege; in particular, especially for

22    the ones that involved external counsel.

23          Now, what the Special Master did do -- I think

24    we need to be, you know, clear on the next step -- the

25    Special Master agreed, and Texas Keystone has adopted this

1    part of the Special Master's report -- he's agreed that

2    the UBS policy did not waive all work product, or work

3    product claims.  And so, first, in terms of

4    attorney-client privilege, those are basically

5    across-the-board rulings by the Special Master that we

6    object to.

7              But specific to work product -- and the review

8    that the Special Master did was a work product review --

9    and in looking at the work product review, a number of

10   issues do come up specific to his conclusions about work

11   product.

12             Any number of the documents that he's found no

13   work product involve the discussions of potential

14   settlement in the context of anticipated litigation.  I

15   think the law on that is clear that such conversations do

16   constitute work product, that you can't separate out a

17   discussion of settlement internally from how that

18   discussion implicates a litigation strategy or an

19   anticipated litigation.  So there is, you know, that

20   objection.

21             As far as the selective waiver objection goes, I

22   think that when you do do a comparant contrast, the

23   Special Master was over-inclusive in terms of finding that

24   documents produced in the London proceeding form the basis

25   of a selective waiver of documents that are on the log.

1              I would also say, as far as the selective waiver

2    goes, it is based on looking at documents that we say are

3    documents that were provided in this proceeding in

4    violation of U. S. procedural -- I'm sorry, U. K.

5    procedural rules where Texas Keystone should have given

6    notice and obtained the permission from the U. K. Court

7    before the Special Master was able to engage in that

8    comparant contrast.

9              So, that runs down I think the various issues in

10   terms of what's at stake here in adopting the Special

11   Master's report.

12             THE COURT:  All right.  Let me kind of run

13   through those kind of one by one.

14             What is it in the record that you assert,

15   Mr. Miller, establishes an attorney-client relationship

16   between Mr. Eric Wempen and anyone?

17             MR. MILLER:  Mr. Wempen and Excalibur.  I think

18   the contents of the communications, those focusing on the

19   ones that don't involve external counsel, either directly

20   or reflects the participation of external counsel, in

21   terms of -- I think the contents of those communications

22   stand on their own, that Mr. Wempen is providing, as a

23   lawyer, is providing legal advice in anticipation of

24   litigation, in part recognizing that external counsel

25   would soon be retained and sort of getting the thinking,

1    the legal strategy, up and going.

2    THE COURT:  Well, let me put it this way.  What

3    evidence is there in the record that Excalibur was Eric

4    Wempen's client?  In other words, it can't be, can it,

5    that anyone who's got a law agree who's engaged in

6    business has got attorney-client privilege over

7    communications that they make about the business simply

8    because they are a lawyer?  There has to be,

9    fundamentally, in the first place, the relationship of

10    attorney and client, and I think that takes more than

11    simply talking about how the law might affect a business.

12    MR. MILLER:  And in this instance, though, Eric

13    is the client.  He is a principal of Excalibur --

14    THE COURT:  No, I understand that, but your

15    argument as I understand it, and correct me if I'm wrong,

16    is that the claim of attorney-client privilege, put aside

17    work product for a minute, the claim of attorney-client

18    privilege is based upon an attorney-client relationship

19    between Eric Wempen, as attorney, and Excalibur, or

20    perhaps his brother, as client.  And what I don't see

21    anywhere is any evidence that they had that relationship.

22    I don't see a retention letter; I don't see an affidavit;

23    I don't see any billings; I don't see, you know, the

24    ordinary kind of evidence of an attorney-client

25    relationship.

1        So I'm pressing you, first off, on what's the

2    basis to believe that Eric Wempen had an attorney-client

3    relationship with anyone, either the company or his

4    brother?

5        MR. MILLER:  Yes, no, I think that the normal,

6    perhaps what we would call the normal indicia of an

7    attorney-client relationship would not exist here since

8    he's, in that limited timeframe, for a limited purpose of

9    anticipating litigation, I wouldn't expect to see a

10   retention rider.  I wouldn't expect to see Eric Wempen

11   billing himself.

12       THE COURT:  Well, perhaps not, but you would

13   expect to see -- or I would expect to see an affidavit

14   that says "Notwithstanding the unusual circumstances of

15   this setup, Eric Wempen was the lawyer we relied upon --

16   we, the company, relied upon and we had this relationship,

17   and instead of turning to outside counsel, we turned to

18   him."  I don't have that.

19       And so what you're saying is the documents speak

20   for themselves, especially when you add the fact that Eric

21   Wempen graduated from law school.

22       And I just don't understand that to be the law,

23   that any person with a law degree or who's a member of the

24   bar, all they have to do is open their mouth about, you

25   know, a business or legal issue and they have created, by

```
1    doing that they've created an attorney-client

2    relationship.

3              MR. MILLER:  And, Your Honor, I understand that,

4    and nor do we think it's the law that an affidavit is

5    necessary to substantiate that.  We think the documents do

6    substantiate it in this instance.  I hear you about the

7    affidavit.  We thought the affidavit was unnecessary in

8    the context of the emails themselves.

9              THE COURT:  All right.  And let's turn to the

10   second issue, which is the one that you think is

11   appealable, which is the reasonable expectation of

12   confidentiality in light of the use of the email server.

13             You seem to make the argument that we don't have

14   the kind of terms and conditions of use of that server

15   during the appropriate time.  Why doesn't -- first off,

16   why isn't that your burden to come forward and say there

17   was no warning that there was no reasonable expectation of

18   privacy, there was no warning about the UBS --

19             MR. MILLER:  Your Honor, I'm sorry, to clarify

20   on that, we do have the written UBS email policy.  UBS

21   produced it at the request of Texas Keystone.  We do have

22   the ones applicable.

23             THE COURT:  Okay.  Do they vary from the one

24   that I saw, which was from 2012?

25             MR. MILLER:  I think to some extent, I think to
```

1   some extent they do vary, but the over -- you know, people

2   probably agree with me on this -- I think the overall

3   reading of any of them is that there is a warning that

4   use, personal use of the email won't be necessarily

5   confidential.

6          But I think that has to be read in the context

7   of the purpose of the UBS email policy.  And the purpose

8   of the UBS email policy was not to stop personal use but

9   to say if these, that if -- in order to protect our own

10  interests, in a SEC investigation, the OJ investigation,

11  whatever it might be, if UBS itself is a litigant, is a

12  party to a litigation, we will do what we want with those

13  documents.  But I don't think that, that is not our

14  situation here, and I don't think the purpose of the

15  policy opens the door to saying that for all purposes, you

16  have absolutely no confidentiality in using the UBS

17  server.

18         Added to that, that in the context of reality,

19  that people use, you know, their employer's email.  When I

20  emailed my wife earlier today using the Clifford Chance

21  email, did I waive spousal privilege?  I just think these

22  issues rise to a level that they need to be looked at, you

23  know, in the context really of that reality.

24         The third thing --

25         THE COURT:  Let me interrupt you before you move

1      to the third thing.

2              The email policy provided that personal use is

3      not private, that UBS owns all employee emails and that it

4      has the right to review those emails.

5              So it may be -- I'm not going to get into the

6      spousal privilege, but in terms of attorney-client, I mean

7      it's got to be a confidential communication.  It's like,

8      it's like with a warning like this, with a policy like

9      this, it's like sitting in a room with your lawyer when

10     somebody else is present.  They may not --

11             MR. MILLER:  And I understand --

12             THE COURT:  They may not be be listening but

13     they have the right to listen if they want to.  They are

14     in the room.  This is the same thing.  We've got emails

15     that may not, as a matter of course, been read but that

16     isn't the issue.  The issue is whether there's a right to

17     them.

18             MR. MILLER:  And, Your Honor, I appreciate that

19     traditional take on the situation, but I don't think

20     that's one that reflects really how people view their own

21     email use.  I don't think -- I think it's one that if we,

22     if we in this instance say that there's been a waiver of

23     the attorney-client privilege under the UBS policy, that

24     sets in motion I think a slippery slope that implicates

25     issues far beyond this case.

```
 1              THE COURT:  Well --

 2              MR. MILLER:  It implicates that the law

 3    sometimes has to be keep pace with reality.

 4              And so I can -- I understand, certainly, I

 5    understand the, yes, from a traditional perspective, you

 6    can come to that conclusion and it certainly is a

 7    reasonable, rational conclusion, that is this is no

 8    different than someone sitting in the room, on the one

 9    hand.

10              On the other hand, though, it was not the intent

11    of the policy, the UBS policy, and it doesn't -- it just

12    does not, it does not, you know, match up to how people

13    really conduct their lives in this -- in the world.

14              THE COURT:  Well, to the --

15              MR. MILLER:  In the universe.

16              THE COURT:  To the extent that you're relying on

17    -- to the extent you're relying on anecdotal evidence of

18    that type, I would counter with my anecdotal sense that

19    it's quite common for people with Smart Phones, and maybe

20    those communications were made via a Smart Phone, to have

21    both a work email and a personal email that pushes through

22    to their Smart Phone.  Personally, I have G mail accounts

23    as well as an office email account and I think that's

24    quite common.  A lot of people I know have two different

25    devices.  They have a work device, a work Smart Phone and
```

1    they have a personal Smart Phone for that very reason.

2                And, you know, I think in light of the, in light

3    of the absence in this record of any facts that would

4    support the argument, I think the policy here is pretty,

5    is pretty damaging to your position, frankly.

6                But even assuming you're right, that still opens

7    up only the next question, which is once, once Mr. Wempen

8    used his office email account, he apparently made -- and

9    there's no indication he made any efforts then to delete,

10   segregate, transfer or otherwise protect those

11   communications.

12               In other words, you know, he didn't do the

13   equivalent, if we want to use analogies, he didn't take

14   those documents that may have been faxed into the public

15   fax machine and put them into a locked filing cabinet.  He

16   either left them in the fax machine or left them on the

17   table nearby for people to look at.

18               So I think you've got another level, or another

19   layer of problem there to deal with, even assuming that

20   your anecdotal argument would prevail.

21               MR. MILLER:  No, and we understand that

22   argument.  We -- the Special Master, I think, hopefully

23   got to the point where, I think recognized the difficulty

24   of segregating out email by a UBS server or deleting them

25   or whatever, but did point out that the emails could have

1   been segregated at least by calling them confidential or

2   personal.

3           THE COURT:  Or privileged.

4           MR. MILLER:  Right, privileged.  And, you know,

5   I think that that really is part and parcel of, if your

6   expectation is that you can engage in a personal email

7   correspondence that's privileged, or that it's your

8   expectation that it's an attorney-client privileged

9   communication, then you don't need to take that step.

10          In particular, if you're engaged in any --

11  again, the large majority of these emails are, you know,

12  involve external counsel, and so I think even more so in

13  that respect, and the Special Master not even

14  acknowledging, addressing the difference between those

15  emails that are what are on the log as in-house, Eric

16  Wempen's email, versus external, I think it is a very

17  significant distinction in that respect, in the respect of

18  this idea that you can put the word "confidential" into

19  the email.

20          THE COURT:  Well, okay.  I think the Special

21  Master got the attorney-client privilege issue exactly

22  right.  I don't believe that there was an attorney-client

23  relationship established here because there's no, no

24  indication that Mr. Wempen was acting as a lawyer with a

25  client and dispensing legal advice pursuant to any

1    attorney-client relationship.  He had no reasonable

2    expectation of privacy, in any event, had there been such

3    a relationship because of the use of an email server that

4    was subject to ownership by a third party, subject to

5    review by a third party and disclosure by the third party.

6    So there's no reasonable expectation that the

7    communications would remain confidential.

8          And finally, there's no effort, assuming that

9    the argument that "this is the way everybody does it"

10   might prevail, there was no effort in this case to either

11   mark them as privileged or to delete them or to extract

12   them, copy them somewhere into a more private forum where

13   they wouldn't likely have been discovered or used or

14   reviewed.

15         And so, again, it seems to me that the

16   attorney-client privilege claim fails for a series of

17   related but independent reasons.  And I'm going to, I'm

18   going to adopt the Special Master report with respect to

19   the attorney-client privilege issues.

20         Let's turn separately to the work product.  I

21   didn't see, Mr. Miller, anywhere where Excalibur tried to

22   argue that any particular document was not a -- was not

23   actually disclosed or was not, the work product coverage

24   was not waived by selective production.  Did you try and

25   preserve that issue before the Special Master in any way?

1          MR. MILLER:  I'm sorry, before the Special

2     Master or before --

3          THE COURT:  Did you preserve in your arguments

4     to the Special Master, in other words, did you seek to

5     argue, when you had the opportunity, that not only is this

6     theory not a good theory, for whatever reason, but if it's

7     a good theory, you know, Documents One, Three, Five, Seven

8     and Nine don't fit within the, even the theoretical

9     confines of that theory.

10         MR. MILLER:  I'm sorry, I'm misunderstanding.

11    What theory?

12         THE COURT:  Well, my understanding is that, with

13    respect to actual disclosure -- there's basically two

14    bases for the Special Master's decision with respect to

15    work product, as I understand it.

16         The first is some of these documents, a number

17    of them, were actually produced and, therefore, the

18    disclosure is a waiver of any work product protection.

19         The second, the second theory, or second

20    position taken by the Special Master is that there was a

21    waiver here by selective production of related information

22    and my understanding is that you argued that neither of

23    those doctrines should apply here for various reasons, but

24    I didn't understand that you had ever argued that any

25    particular document among those that were submitted for in

1    camera review was the subject of waiver under either of

2    those when it was properly applied.

3         MR. MILLER:  I would just add, Your Honor,

4    there's also a third, that the Special Master in certain

5    instances found that it just was not work product, and I

6    think the settlement is a good example of that third

7    category.

8         THE COURT:  Well, certainly there was somewhere

9    he held that there were not -- there was no claim of work

10   product protection.  Were there others that he --

11        MR. MILLER:  Yes, I think overall, you know, to

12   complete that thought, I think there are four types of,

13   four categories of documents on the Special Master's log.

14   One is where we did not invoke work product, and so we

15   only invoked attorney-client.  We know where the Court

16   stands on that, that that document is not protected.

17        The second category is one where the Special

18   Master found that that document had been produced in the

19   London proceeding, and so we thought the same document has

20   been produced in the London proceeding, it's not protected

21   here.

22        The third category of documents is in comparing

23   documents produced in the London proceeding and looking at

24   the documents on the log, the Special Master found

25   selective waiver.

1          And there is a fourth category that the Special

2   Master found is just not work product.  Whether waived or

3   not, it is not work product.

4          So, for example, there are a large swath of

5   documents, I think starting at around 113 --

6          THE COURT:  Right.

7          MR. MILLER:  -- of his log --

8          THE COURT:  Right.

9          MR. MILLER:  -- where he said that the, the --

10  there's no work product, it's not work product in and of

11  itself because the discussion had to do with settlement.

12  The position we've taken on that, which is that that's not

13  correct, that discussions of settlement in the context of

14  litigation or anticipated litigation can constitute work

15  product.  So I think those are the four categories.

16         In terms of whether we preserved arguments

17  before the Special Master, reached those conclusions, I

18  think they've all been preserved, in saying that we

19  don't -- that to the extent you're going to determine

20  selective waiver, you can do that analysis and you can

21  determine whether there is or isn't selective waiver.

22         So, from our perspective, we now have those

23  conclusions and we're disagreeing with those conclusions.

24  To me that's a sort of the normal course.

25         As far as, you know, the category that we didn't

1   invoke work product, well, you know, obviously those, you

2   know, that position was preserved by arguing they're

3   attorney-client privilege.

4        And this other category, say, for example, the

5   settlement or picking up on issues, you know, here and

6   there, to certain conclusions, again, it's reacting to,

7   you know, Special Master's findings basically.

8        MR. LAUN:  Your Honor, Pete Laun, if I may on

9   that point, I've done a fair amount of this privilege work

10  obviously, as we all have, and I mean certainly if someone

11  had put a bunch of documents into evidence and said I

12  think you've waived work product by, by producing these

13  documents because they are a lawyer opining on topic, I

14  certainly would have submitted something to Special Master

15  explaining why that wasn't waiver on a document by

16  document basis.

17       If Your Honor's question is was that done or was

18  that not done, that was not done.  They made sort of

19  general arguments, but as far as trying to rebut any of

20  the documents that we put in quite a while before this was

21  referred to the Special Master, that was never done.

22       MR. MILLER:  Again, documents that were put in

23  in violation of U. K. procedure.

24       THE COURT:  No, right, I understand.  That's my

25  point.  In other words, Mr. Miller, you're raising what

1    I'll call a general attack on the work product

2    determination; i.e., you shouldn't find, Judge, you

3    shouldn't find there's been waiver by selective production

4    because they shouldn't be using those documents to

5    demonstrate it.

6         And I understand that argument, but what I was

7    trying to figure out is did you take the next step and

8    say, you know, document whatever, 106, we never, we never

9    waived that by selective production because that document

10   has nothing to do with anything we produced that's similar

11   to that, and, therefore, that selective production waiver

12   theory simply doesn't apply to 106.

13        MR. MILLER:  No, Your Honor.  On a document by

14   document basis, prior to the Special Master's review, we

15   did not make that argument, preferring to have the review

16   done and now we're reacting to the conclusion.

17        So, in my understanding of how this was teed up,

18   there would be a Special Master review of the document and

19   that we would have an opportunity to object, and that's

20   what we did.  We've made objections to particular findings

21   of the Special Master on the work product issue and filed

22   those objections.

23        THE COURT:  Right, but even in those objections,

24   you're not saying, for example, you know, 106 -- I don't

25   know, I haven't looked at 106 to figure out whether it's a

1    good one, but just throwing this number out there, 106,

2    the Special Master said it was waived by selective

3    production and we're going to show you now why that's not

4    true.

5           MR. MILLER:  So -- I'm sorry, maybe -- we did

6    file something on Wednesday to that effect that raises

7    specific objections on the Special Master findings and

8    work product findings.

9           THE COURT:  And that's your opposition to the

10   motion to adopt?

11          MR. MILLER:  Yes, and that was filed -- we

12   got -- it got docketed October 3rd, the October 3rd filing

13   that we made got docketed as responses to the motion to

14   adopt, so we filed it, an opposition to the motion to

15   adopt.

16          THE COURT:  Yes.

17          MR. LAUN:  And on the time schedule, the time

18   schedule was they were supposed to file objections two

19   days earlier, which they didn't do, so what they did is

20   got our motion to adopt and then filed a response to that

21   two days later.

22          THE COURT:  Well, fair enough, but what I'm

23   just -- I'm looking at that opposition and it's, you know,

24   it's not especially document-specific.  There is, for

25   example, I guess the closest you get is you mention

Entries 172, 174 and 175 specifically.  But, in general,

what you're doing is raising your higher level argument,

either that there was a misuse of documents or, you know,

waiver by selective production shouldn't be found in this

case generally.

MR. MILLER:  Your Honor, I think our view of

that filing is that it does specifically identify the

entries where, per the Special Master's log, found there

was no work product because the documents discuss

settlement and accepting the Special Master, Special

Master's right, the documents discuss settlement, and so

the objection across the board to that group of documents

which we identify is that, however, those documents are

work product, that the discussion of settlement in the

context of anticipated litigation is still work product.

There's really not much more to say about that category of

documents.

In terms of other documents, we do lay out

specific arguments, here and there a particular one.  The

last category in terms of selective waiver, we do point to

documents that the entries that the Special Master found

selective waiver and said when you take that document

though and compare it to the documents he looked at, which

the Special Master does reference in his log, we think

that that's a mistake, that's not a correct finding of

1    selective waiver.

2          So, I think we do lay out and I think specify

3    the entries that are -- call it most objectionable, the

4    basis for those objections, and I don't see really what

5    else we could have done.

6          MR. LAUN:  Your Honor, I'll tell you how I would

7    have done it, which is that I would have submitted some

8    evidence.  For example, they make -- this is Steve Laun

9    speaking, of course -- they make, for example, on Document

10   172 they make the assertion that's something here that was

11   prepared in anticipation of litigation.  It's fine to say

12   that but you're supposed to support it with some sort of

13   evidence that says, for example, you know, I, Eric Wempen,

14   prepared this in anticipation of litigation for the

15   following purpose.  There's no evidence of that.

16         And then, if Your Honor turns to the sort of the

17   broader discussion of, that you were just looking at of 9

18   through 14, they take a few examples and take issue with

19   those examples, but there's really no attempt to go on a

20   sort of document by document basis and explain why they

21   think the Special Master is wrong.

22         In my view, these simply are not proper

23   objections, certainly not what I would have done.  Maybe

24   I'm wrong, but that's not how you handle objections.  You

25   go on a document by document basis and you put in evidence

1    as to why the Special Master is wrong.

2            MR. MILLER:  Well, as to the, as to the

3    settlement, there's really no evidence to put in.  The

4    legal conclusion, not briefed by or actually spoken to by

5    the Special Master and we think it's a legal conclusion

6    that's wrong.

7            As far as specific documents on selective

8    waiver, our overall argument is that you need to revisit

9    the comparison that the Special Master's done that we

10   pointed out any number of examples where it's just -- he's

11   not correct, and we've explained why he's not correct,

12   that if you look at the document on the log versus the

13   document that the Special Master relied upon in saying

14   there was a selective waiver, that there is none.

15           And so I can appreciate maybe a chart might have

16   made it seem more robust, but at the end of the day, it's

17   robust.

18           THE COURT:  All right.  Let me hear if there's

19   anything else from either of you on the work product

20   issue.

21           MR. LAUN:  Your Honor, Pete Laun.  From our

22   perspective, we think the Special Master' review --

23   obviously we have can't see the privileged documents so

24   we're probably the least informed on this, but we produced

25   a fairly significant compendium of documents showing all

1      the different categories of legal advice and work product

2      that they produced in London, presumably because they

3      liked the documents, and we think to the extent that the

4      Special Master carefully reviewed those documents and

5      compared the documents over which they claim privilege, we

6      just -- we're the least informed on that issue but we

7      didn't really have a basis to overturn it because in our

8      view he did precisely that which the Court asked him to

9      do, which was to go document by document and figure out

10     the merits of the claims, and that's what he appears to

11     have done.

12          MR. MILLER:  And all we asked for on that, Your

13     Honor, we pointed to specifically, specific log entries

14     where we think the Special Master is wrong, whether as a

15     matter of law or in the actual review of the documents

16     themselves.

17          THE COURT:  Okay.  Well, this is what I'm going

18     to do on the work product.  It's my present intention, and

19     what I'll do is, I guess, conditionally approve the

20     Special Master report at this moment.  It seems to me that

21     the legal arguments raised by Excalibur fail, that is, the

22     actual disclosure is a waiver and if there's a problem,

23     then it's a problem that has to be raised and decided in

24     the English Court, not in this Court.

25          What I've got is the actual disclosure of some

1    of these documents and it's hard to say -- you can't say

2    that they are still protected by work product at that

3    point.  So that, that basis I think the Special Master got

4    right and the waiver by selective production, it seems to

5    me, is also clearly an appropriate legal determination of

6    the, the elimination, if you will, the waiver of the work

7    product protection by production of related documents.

8         What I have not had a chance to do in sufficient

9    detail to issue a final order at this moment, but I intend

10   to do it this afternoon, is to review the documents that

11   are at issue, a number of which I reviewed but I have not

12   completed that review, and just confirm that I agree with

13   the calls that were made by the Special Master on a

14   document by document basis.

15        Unless you hear otherwise from me, you should

16   assume at this point that I'm going to adopt the

17   determinations made by the Special Master.  So far, so

18   good, I have been in agreement with his determinations,

19   but like I say, I haven't had a chance to look at each of

20   these yet.

21        MR. MILLER:  Your Honor, we would ask in that

22   review to consider the objection we've made to documents

23   that reference settlement, that in any number of

24   instances, the only reason for the Special Master

25   overruling work product was the conclusion on the log that

1  a discussion of settlement is not in and of itself work

2  product.  Per our filing on Wednesday, we think that is an

3  incorrect legal basis to say that there is no -- that it's

4  not work product.  So I would ask that, please, ask the

5  Court pay attention to that.

6          THE COURT:  Certainly, I'm happy to do that.  I

7  will be taking a look at those.

8          MR. MILLER:  So, Your Honor, overall, if I

9  understand correctly, we're going to get a conditional

10  ruling adopting the report, and we, Excalibur, have until

11  October 12th to formally put this to the Court in London,

12  and if so, the documents will remain not produced until

13  the Court in London ultimately decides the issues.

14          MR. LAUN:  Your Honor, let me just -- there's

15  one thing I quibble with with what Mr. Miller said a

16  couple times and with what he just said now.  I don't

17  think it's a situation that documents remain not produced.

18  I think more in line with what Your Honor said, is that

19  UBS would be ordered to produce them essentially in escrow

20  to a third party for holding.

21          So it's not that it hasn't been ordered to

22  produce them, but rather, they will produce them, it will

23  be held by a third party pending whatever happens in the

24  U. K. action, with instructions to release them if the

25  U. K. action doesn't get this resolved.

1          MR. MILLER:  Pete, I think even better than

2     that, what I would propose is actually creating the

3     production, conforming it to Mr. Silvestri's log so

4     that -- because there's a lot of sustains on there as

5     well.  So, actually taking that step in the interim,

6     creating the production, it conforms to the log, and

7     assuming, Your Honor, you do wholesale adopt the Special

8     Master's report, there will be a production ready to go.

9     What Mr. Silvestri has now and what you, Your Honor, have,

10    are documents that are not ready to be produced.

11         MR. LAUN:  Yes, I agree with that.  I think what

12    is there should be is a set created and held in escrow

13    that tracks the Special Master's log so that whatever the

14    U. K. Court needs to see and whatever it decides, that

15    they are ready to go.

16         THE COURT:  All right.  And, Mr. Laun, I take it

17    you have no objection to Mr. Miller preparing and holding

18    that set of disclosures.

19         MR. LAUN:  Preparing, no.  Holding, yes.  I

20    think they should go to a third party.

21         MR. MILLER:  We'll provide them to

22    Mr. Silvestri.

23         MR. LAUN:  Yes, I think that's totally

24    appropriate.  And, you know, I think that's probably the

25    right way to go, because obviously we don't want any

suggestion that, in fact, we have agreed not to have these
produced if the Court so orders.

THE COURT:  Well, okay.  I'm trying, to a
certain extent, to save Mr. Silvestri some trouble.

MR. LAUN:  Sure.

THE COURT:  And, frankly, to get you the
documents sooner rather than later.  I mean if he happens,
Mr. Silvestri happens to be unavailable or whatever, isn't
it -- you two have been dealing with each other.  If I
order the documents produced at the close of business
October 12th, unless a motion is filed, and then produced
when that motion is decided by the English Court, aren't
you going to get them faster?

MR. LAUN:  You know, I don't know is the answer.
I would certainly hope so, but I don't know what efforts,
what actions Excalibur, or rather Clifford Chance might
take.  I don't know, Your Honor.  I would hope if Your
Honor orders production, we would see the documents
forthwith, but I don't know.

MR. MILLER:  Your Honor, there's a lot of water
under the bridge, not so much as between U. S. counsel,
Clifford Chance and Jones Day, but over in London.  I
understand where Mr. Laun is coming from.  I think it
would be easiest just to, unfortunately, have a set with
Mr. Silvestri.

1              That said, we will obviously have a copy of

2       that.

3              THE COURT:  Right, okay.

4              MR. MILLER:  So -- but I think to appease

5       Mr. Laun's concern, that is, you know, it's just making

6       another copy set and we can do that.

7              THE COURT:  All right.  So --

8              MR. LAUN:  We'd be happy, Your Honor, with some

9       deposit with the Court.  Whatever Your Honor thinks is the

10      best approach, we're fine with.  We'll go with whatever

11      Your Honor thinks is best, let me put it that way.

12             THE COURT:  Okay.  Well, look, as long as it's

13      clear, Mr. Miller, you're going to prepare these sets,

14      you'll have one, you'll get one to Mr. Silvestri.  And

15      you'll -- if and when that time comes, you'll confer with

16      Mr. Laun and get that produced at the earliest possible

17      time.

18             MR. MILLER:  Yes, we will do that.

19             THE COURT:  Okay.  All right.  So we'll issue an

20      order, a written order that will be docketed with respect

21      to the motion to adopt the Special Master's report and the

22      motion to compel.

23             The last item I have is the reported order

24      number three regarding fees.  Anybody want to be heard on

25      that?

1          MR. MILLER:  Your Honor, I understand where the

2    Special Master is coming from on that.  We really don't

3    have an objection.  Maybe if we knew the amount of money

4    at issue.  But it's a reasonable take, and so we don't

5    object, but we would like the opportunity to know how much

6    money is really at stake.

7          THE COURT:  Okay.

8          MR. MILLER:  I mean, despite my saying it's a

9    reasonable position to take, there are any number of

10   things I could say --

11         THE COURT:  Oh, fair enough, I understand.

12         MR. MILLER:  -- as it not really being a, not

13   really reflecting what -- the situation.  But if we're

14   talking about thousands of dollars, that's one thing.  If

15   we're talking tens to twenties, that's another, and I just

16   don't want to waste the Court's time unless we feel it's

17   necessary to put in a submission and simple raise our

18   thoughts on that.

19         MR. LAUN:  For Texas Keystone, Your Honor, I

20   don't need to be heard on that at all.

21         THE COURT:  Okay.  Well, would anybody have an

22   objection with Mr. Miller inquiring of Mr. Silvestri what

23   is the approximate amount of money that he intends to bill

24   on this file?

25         MR. LAUN:  Peter Laun.  None whatsoever, Your

1    Honor.  I'm happy to have him do it and he can let us

2    know, too.  That way we'll all know.

3              THE COURT:  All right.

4              MR. MILLER:  And just to be make sure we're in

5    compliance, Your Honor, I'm going to ask Meg Farrell of my

6    firm to do that.

7              THE COURT:  Fine.  That is fine.

8              MR. LAUN:  No, I insist that Jim do it actually.

9              (Laughter)

10             THE COURT:  All right, well, I'm going to -- I'm

11   going to give him either a call or email and let him know

12   he can expect a contact on that issue and that may give

13   him enough time to pull together some rough numbers.

14             MR. LAUN:  He was -- from both parties, I'm sure

15   Your Honor knows, he was sent a retainer and it may be

16   this is all within the retainer.  It's hard to say.  I

17   would be actually somewhat surprised if it weren't largely

18   within the retainer.

19             THE COURT:  All right.  Well, let's just do

20   this.  Let's set a deadline for objections to report and

21   order number three, and why don't we say a week from

22   today.  If anybody objects to my adopting that report and

23   order, has to be filed by a week from today.

24             And my expectation is that he can get you some

25   rough numbers probably Monday or Tuesday.  Monday is a

```
1    holiday.  I don't know if he's observing that holiday or
2    not, but my guess would be that he's not.  Does that work
3    for everybody?
4              MR. MILLER:  We'll follow up one way or another.
5    We'll be able to find out what the estimate of the fee is
6    and make some decision, so --
7              THE COURT:  Okay.  But is a week from today
8    enough time to make a decision whether to object.
9              MR. MILLER:  Yes.  And like I said, I mean
10   obviously it can't really be, at the end of the -- in the
11   scope of things, Your Honor, a lot of money, but I don't
12   want to commit without knowing how much money.
13             THE COURT:  That's fair enough.  Fair enough.
14             All right.  Anything else we can usefully do
15   today?
16             MR. MILLER:  No, I think this has been very
17   helpful.  Thank you.
18             MR. LAUN:  Thank you very much for your time,
19   Your Honor.  Thanks for stepping into this so quickly in
20   light of the circumstances.  We really appreciate it.
21             THE COURT:  Yes, well, I know you or your
22   corresponding counsel are going to be busy very soon.
23             MR. LAUN:  No doubt about that.
24             THE COURT:  All right.  Take care everybody.
25   Have a great weekend.  We'll get an order out soon.
```

1              (Whereupon the above matter was adjourned at 4:30

2       o'clock, p. m.)

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci

_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761